IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | NO. 07-75-4 |
| v. | : | |
| | : | CIVIL ACTION |
| THOMAS HEILMAN | : | NO. 11-4181 |

MEMORANDUM

Bartle, J.                                                October 20, 2011

      Before the court is the motion of defendant Thomas Heilman to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255.

      Heilman was found guilty by a jury on October 4, 2007 of conspiracy to distribute methamphetamine, in violation of 18 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846. In responses to special interrogatories, the jury also found that the quantity of methamphetamine that Heilman conspired to deliver was greater than 50 grams but less than 500 grams. He was sentenced on January 4, 2008 to a term of 235 months of incarceration, a term of supervised release of five years, joint and several forfeiture with his co-defendants of $6 million, and a special assessment of $100. The Court of Appeals for the Third Circuit affirmed the judgment and sentence on April 21, 2010. See United States v. Heilman, 2010 WL 1583097 (3d Cir. Apr. 21, 2010). It issued its mandate on May 19, 2010.

      Heilman now alleges in his § 2255 motion that he was deprived of his Sixth Amendment right to effective assistance of

counsel through a series of errors made by his attorney during the trial and sentencing. On October 17, 2011, the court held an evidentiary hearing limited to the issue of whether Heilman's trial counsel advised him of both the advantages and disadvantages of testifying on his own behalf.

I.

The underlying facts, in the light most favorable to the Government, are as follows. Between January 2003 and June 2006, co-defendant John Napoli organized and led a racketeering enterprise, known as the Pennsylvania Chapter of the Breed Motorcycle Gang. This organization was a hierarchical motorcycle gang with a strict authoritarian leadership located in Bristol, Pennsylvania. The Breed gang trafficked 125 pounds of crystal methamphetamine over that three-year period.

From approximately March 2006 through June 2006, co-defendant William Johnson became the principal supplier of methamphetamine to the Breed gang. Napoli directed that the methamphetamine from Johnson be distributed to numerous mid-level distributors inside the Breed gang, including Heilman. The latter purchased varying quantities of these drugs from Napoli on a "fronting" basis, that is, that Napoli deferred payment for the drugs until Heilman had re-sold them to retail customers. At trial, Kerry Shearer testified that, in August 2005, he sold Heilman two ounces of methamphetamine on behalf of Napoli. Eric Loebsack testified that, on three occasions, he distributed over a pound of methamphetamine to Heilman at Napoli's direction. In

addition, the record reveals that Christopher Quattrocchi, David Serviolo, and David Frenier witnessed various purchases and sales of crystal methamphetamine by Heilman.

Within the Breed gang, violence was frequently used to ensure loyalty and compliance with orders from leadership. On November 24, 2005, Napoli, Johnson, and Quattrocchi, along with other Breed members, brutally beat past-Breed president James Graber based on Napoli's belief that Graber had stolen money from a game machine in the gang's clubhouse. This organized beating was formally approved by the "Breed Executive Board" a week in advance. The beating resulted in Graber spending four days in the intensive care unit of the hospital with damage to his back, head, liver, and spleen. Although Heilman was not charged in connection with this beating, evidence presented at trial showed that Heilman drove Graber to the club meeting where he was beaten and was in or about the clubhouse during the beating. He then drove Graber home and took Graber and Graber's wife to the hospital.

On June 6, 2006, as part of the Pennsylvania state police's investigation of the Breed gang, Heilman's home was searched. The search recovered approximately 7 grams of crystal methamphetamine, several items containing white powder, a .22 caliber rifle, shotgun ammunition, knives, swords, daggers, a bucket of 40 weighted batons, and Breed gang paraphernalia.

On October 2, 2007, after an eleven-day trial, the jury found Heilman guilty of conspiracy to distribute and possess with

intent to distribute methamphetamine, the only count in the second superseding indictment with which he was charged. The jury was presented with two special interrogatories as to Heilman. The first asked: "With respect to Thomas Heilman, was the amount of methamphetamine distributed or possessed with the intent to distribute by the conspiracy as a whole, and reasonably foreseeable to this defendant, 500 grams or more?" The jury answered, "No." The jury then moved to the second interrogatory: "With respect to Thomas Heilman, was the amount of methamphetamine distributed or possessed with the intent to distribute by the conspiracy as a whole, and reasonably foreseeable to this defendant, 50 grams or more?" The jury answered this interrogatory, "Yes."[1]

As noted above, at sentencing, the court imposed a sentence that included 235 months of imprisonment. Heilman appealed to the Court of Appeals for the Third Circuit. As noted above, the Court of Appeals affirmed.

Thereafter, Heilman timely filed his § 2255 motion based on a number of grounds. On October 17, 2011, the court held an evidentiary hearing limited to the issue of whether

---

1. Of Heilman's co-defendants, only Napoli and Johnson also went to trial. The remainder entered pleas of guilty. Napoli and Johnson were also found guilty of the conspiracy to distribute methamphetamine, in addition to various other counts in the second superseding indictment. In response to special interrogatories, the jury found that it was reasonably foreseeable to Napoli and Johnson that the amount of methamphetamine possessed and distributed by the conspiracy was 500 grams or more.

-4-

Heilman's trial counsel advised him of both the advantages and disadvantages of testifying on his own behalf.

II.

Heilman alleges in his § 2255 motion that he was deprived of his Sixth Amendment right to effective assistance of counsel as a result of four errors made by his counsel during trial and sentencing. First, he alleges that counsel erred in failing to request a jury instruction for the distribution of less than 50 grams of methamphetamine. Second, he contends that counsel did not call Heilman to testify in his own defense or otherwise advise him of the advantages of doing so. Third, Heilman argues that his counsel was ineffective in failing to obtain a stipulation from the government as to the facts concerning the beating of James Graber in order to prevent the jury from hearing graphic testimony. Finally, he maintains that his attorney failed to argue that Heilman's age was a factor that the court should consider at sentencing.

Under the Strickland standard, Heilman bears the burden of proving that: (1) counsel's performance was deficient; and (2) he suffered prejudice as a result. Id.; United States v. Nino, 878 F.2d 101, 103 (3d Cir. 1989). The first prong requires that "[counsel's] performance was, under all the circumstances, unreasonable under prevailing professional norms." United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992).

Our scrutiny of counsel's performance is highly deferential in that we presume counsel's actions were undertaken

in accordance with professional standards and as part of a "sound trial strategy." Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). To satisfy the prejudice prong, Heilman must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome." Id. When ruling on a § 2255 motion, the court may address the prejudice prong first "and reject an ineffectiveness claim solely on the ground that the defendant was not prejudiced." Rolan v. Vaughn, 445 F.3d 671, 678 (3d Cir. 2006).

In his motion, Heilman alleges that "counsel was ineffective for failing to put Heilman on the stand to testify on his own behalf, as reasonably the jury from that testimony, and possible cross-examination, may have then seen that he could not have reasonably foreseen the entire scope of the Breed methamphetamine distribution operation." While Heilman does not argue that his attorney prevented him from testifying or failed to tell him of his right to testify, he does contend that counsel failed to discuss with him the advantages of testifying and instead only told him about the disadvantages. He maintains that his testimony would have given the jury a basis on which to doubt the credibility of Serviolo, the "confidential informant" who testified against him. Heilman avers that his testimony would

have convinced the jury to find him responsible for distributing less than 50 grams of methamphetamine.

As noted above, we held an evidentiary hearing on October 17, 2011 regarding this issue of whether counsel told Heilman about both the advantages and disadvantages of testifying on his own behalf. During the hearing, Heilman and his trial counsel each testified and their testimony diverged. Counsel stated that he and Heilman had discussions on multiple occasions about whether Heilman should testify. According to counsel, he advised Heilman that the advantages to testifying on his own behalf were that he could deny the Serviolo drug sale and attempt to explain away certain evidence found in his house. As for the disadvantages, counsel told Heilman, who was afraid to testify, that he would be subject to cross-examination about his co-defendants John Napoli and William Johnson. Both Napoli and Johnson were violent leaders of the Bread Motorcycle Gang. Counsel, who was well-acquainted with Heilman, was also concerned about his potential demeanor on the stand and his ability to withstand cross-examination. Counsel stated that Heilman was afraid to testify and voluntarily made the decision not to do so.

Heilman testified at the hearing that counsel only once discussed the possibility of him testifying on his own behalf at trial. According to Heilman, this discussion consisted of counsel merely asking Heilman if he had a problem taking the stand and Heilman responding that he did not have a problem. Heilman further stated that counsel told him in the middle of

trial that he decided not to put him on the stand.  Heilman emphasized that he had been ready and willing to testify at the time of his trial.

We find that counsel's testimony at the evidentiary hearing was credible and that Heilman's contrary testimony at the hearing was not credible.  We find that counsel discussed with Heilman both the advantages and disadvantages of his testifying and that Heilman made an informed decision not to testify.  There is thus no reasonable basis on which to believe that counsel's performance fell below the prevailing norms of professional conduct.

Moreover, even if we were to find that counsel's performance was defective, there is no evidence that Heilman was prejudiced by failing to testify on his own behalf.  Heilman has not averred with any specificity what the nature and contents of his testimony at trial would have been to support his contention that a reasonable probability existed that the outcome of his trial would have differed.  At trial, five witnesses, not just Serviolo, testified that they observed Heilman engage in the sale of methamphetamine on multiple occasions.  In addition, the government seized 7 grams of crystal methamphetamine when they searched his house on June 6, 2006.

In addition to cross-examination concerning his knowledge of and assistance with the Graber beating, Heilman's extensive prior criminal record would have been revealed. According to the presentence investigation report, Heilman's

criminal history includes convictions for terroristic threats, simple assault, criminal conspiracy, criminal trespass, carrying a firearm without a license, aggravated assault, reckless endangerment, and possession of controlled substances and drug paraphernalia. These convictions span Heilman's entire adult life, from the time he was 25 until 53. Accordingly, even if we had found that counsel's performance was deficient, we do not find that there is a reasonable probability that the result of the trial would have been different if Heilman had testified.

   The remainder of Heilman's contentions regarding his counsel's ineffectiveness are without merit. Heilman argues that his counsel was ineffective in failing to ask for a jury instruction that, if the jury found him guilty of conspiracy to distribute methamphetamine, they could determine that the amount of drugs involved was less than 50 grams. However, the court, in effect, did just that. When the court posed the second special interrogatory to the jury asking if the amount of methamphetamine distributed or possessed with intent to distribute and reasonably foreseeable to Heilman was 50 grams or more, it gave the jury an opportunity to decide that Heilman could <u>not</u> have reasonably foreseen that amount. Had it believed that Heilman could not have foreseen that over 50 grams would be distributed, the jury could have answered that special interrogatory in the negative. Counsel's failure to ask for a special instruction to that effect created no prejudice to Heilman since the jury was asked to determine whether Heilman could have foreseen that amount and

found that the government had proven beyond a reasonable doubt both that Heilman was guilty of the conspiracy charge and that more than 50 grams of methamphetamine was involved in the conspiracy.

Heilman also contends that his counsel erred in not seeking a stipulation from the government as to the facts of the Graber beating. As noted above, Heilman was not charged with participation in the beating, although the evidence shows that he drove Graber to and from the clubhouse where the beating took place and remained in or around the clubhouse during the beating. There is no evidence that the government would have entered any stipulation regarding the Graber beating as such testimony was necessary evidence as to charges against Heilman's co-defendants. To protect Heilman from any prejudice from this evidence, the court instructed the jury at the outset of trial, "You should not attach any significance to the fact that the defendants are being tried together. Each defendant is entitled to your separate consideration and you must give separate consideration to the case against each defendant. Do not think of them as a group." Again, at the close of trial, the court gave the following instructions:

> There are eleven counts in the second superseding indictment in this case which you must consider. ... Different defendants have been charged with different offenses. ... Each count and the evidence pertaining to it must be considered separately. The fact that you may find a defendant not guilty or guilty as to one of the offenses charged in the second superseding indictment should not

> control your verdict as to the other offenses
> charged in the second superseding indictment.

In addition, the court provided to the jury separate verdict sheets for each defendant. The verdict sheet for Thomas Heilman listed only the sole conspiracy count charged against him and made no reference to the Graber beating. The court gave a proper instruction to the jury as to how to consider the evidence. No prejudice resulted from counsel's failure to request a stipulation about the Graber beating. There is no evidence that the government would have agreed to stipulate to those facts, and the court properly instructed the jury to compartmentalize their consideration of the charges against each defendant.

Finally, Heilman contends that counsel erred in failing affirmatively to raise his age as a distinct basis "to depart downward" at sentencing. Counsel did argue that Heilman's general health conditions should cause the court to deviate from the advisory guidelines range. In the court's consideration of that argument at sentencing, the court specifically addressed Heilman's age and considered it in its sentencing decision. No prejudice resulted from counsel's failure to raise Heilman's age as a separate ground because the court did consider it as a factor at sentencing.

There are no grounds upon which the court can grant relief to Heilman. Accordingly, we will deny Heilman's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255.